**DTM RESEARCH, L.L.C.,**
**Plaintiff–Appellee,**

**and**

**United States of America,**
**Intervenor–Appellee,**

**v.**

**AT & T CORPORATION,**
**Defendant–Appellant.**

**No. 00–1450.**

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 24, 2001.

Decided March 27, 2001.

**ARGUED:** William Norman Withrow, Jr., Troutman Sanders, L.L.P., Atlanta, GA, for Appellant. Alisa Beth Klein, Appellate Staff, Civil Division, United States Department of Justice, Washington, DC, for Appellee United States. Ralph S. Tyler, Hogan & Hartson, L.L.P., Baltimore, MD, for Appellee DTM. **ON BRIEF:** C. LeeAnn McCurry, Troutman Sanders, L.L.P., Atlanta, GA; David B. Hamilton, Kelly J. Davidson, Ober, Kaler, Grimes & Shriver, Baltimore, MD; Laura A. Kaster, AT & T Corporation, Liberty Corner, NJ; Kathryn E. Thiel, AT & T Corporation, Oakton, VA, for Appellant. David W. Ogden, Acting Assistant Attorney General, Lynne A. Battaglia, United States Attorney, Mark B. Stern, Appellate Staff, Civil Division, United States Department of Justice, Washington, DC, for Appellee United States. Douglas R.M. Nazarian, Hogan & Hartson, L.L.P., Baltimore, MD, for Appellee DTM.

Before NIEMEYER and KING, Circuit Judges, and FABER, United States District Judge for the Southern District of West Virginia, sitting by designation.

## OPINION

NIEMEYER, Circuit Judge:

DTM Research, L.L.C. ("DTM"), a Maryland limited liability company, commenced this diversity action against AT & T Corporation ("AT & T"), seeking a declaratory judgment, injunctive relief, and $24 million in damages. The complaint alleges that AT & T misappropriated DTM's trade secrets during the course of contract negotiations between the two companies involving AT & T's possible employment of DTM's expertise in data mining. During the course of discovery, AT & T issued subpoenas to agencies of the United States and persons who have dealt with the agencies to discover evidence in support of AT & T's hypothesis that DTM's claimed trade secrets related to technology that DTM misappropriated from the United States. When the district court granted the United States' motion to quash the subpoenas, based on the United States' assertion of a "state secrets" privilege, AT & T moved for summary judgment on the ground that the district court's protective order precluded it from defending the case effectively. The district court denied AT & T's motion, but agreed to certify two issues to this court under 28 U.S.C. § 1292(b). Although the questions cannot be definitively answered in the absence of fact-finding, we affirm the district court's conclusions at this stage of the proceedings.

### I

In connection with AT & T's interest in efficiently marketing its telecommunications products and services to the rapidly growing work-at-home market by better exploiting its own extensive databases, it entered into negotiations with DTM in early 1995. DTM claimed special knowledge and expertise in analyzing large amounts of data and offered its "Orca Blue" process, which it described as a "new and unprecedented group of methods, techniques and processes for mining and analyzing immense quantities of call detail data, to identify, for marketing purposes, various segments of the population from telephone-call records." Because DTM claimed that its knowledge and information were trade secrets, it demanded that AT &

T personnel who would be evaluating "Orca Blue" enter into confidentiality agreements.

AT & T personnel signed the confidentiality agreements and then worked with DTM personnel to set up a demonstration of DTM's data mining techniques in a limited market in San Diego. Following the demonstration, AT & T acknowledged that the results were promising. The parties could not, however, agree on a contract because AT & T believed that the $24 million asking price was too high and that it would be better served if it used its own in-house capability to complete the task of data mining. AT & T also believed that issues of customer confidentiality counseled against awarding the contract to DTM because the operation of "Orca Blue" might require sharing confidential consumer information with DTM.

Following AT & T's rejection of DTM's proposals, DTM filed this action, alleging that AT & T terminated negotiations only after obtaining its trade secrets in "Orca Blue" and that AT & T then incorporated the secret information into its already existing technology, thereby allowing it to enhance its in-house capabilities at the expense of DTM. AT & T's defense is, in part, based on its "belief" that aspects of "Orca Blue" had been misappropriated by DTM from the United States in the course of work that DTM and other companies had earlier performed for the United States. AT & T also believes that the alleged "trade secrets" involve technology commonly used throughout the industry.

To discover evidence relating to its defenses, AT & T issued subpoenas to various agencies of the United States, as well as to various commercial entities that allegedly had worked in developing technology for the United States to obtain evidence to prove that whatever trade secret existed in "Orca Blue" did not belong to DTM but rather to the United States. The United States intervened and, invoking the "state secrets" privilege, moved to quash AT & T's subpoenas. The United States took no position on whether the technology at issue is similar to any technology that it owns but claimed that *any* inquiry into technology of the type described in AT & T's subpoenas would threaten national security. The district court granted the government's motion and severely circumscribed AT & T's discovery in this area. AT & T then filed a motion for summary judgment, arguing that the district court's order quashing its subpoenas prevented AT & T from freely and fairly defending the claims brought against it and that therefore the district court should enter judgment in favor of AT & T.

After denying AT & T's motion, the district court nevertheless granted AT & T's request to certify two issues to this court under 28 U.S.C. § 1292(b). The district court posed the following questions:

1. Did the Court, in its Opinion and Order of December 10, 1999 correctly hold that fee simple ownership is not an element of any of the claims set forth in Plaintiff DTM's Complaint against Defendant AT & T for violation of the Maryland Trade Secrets Act (Count I), violation of a confidentiality agreement between the parties (Count II), quantum meruit (Count III), and unjust enrichment (Count IV)?

2. Do the Court's Orders of December 10, 1999 and November 25, 1998 which preclude inquiry into the alleged theft of DTM of trade secrets from the U.S. government (based on the Government's assertion of the state secrets privilege) deny AT & T a fair trial and therefore require termination of all or any part of this litigation?

By order dated April 19, 2000, we granted permission to appeal.

## II

On the first question posed, the district court, applying Maryland law, which the parties agree applies, ruled:

> The court is persuaded by DTM's argument that ownership—in the sense of fee simple absolute title—is not necessary and that mere possession is sufficient to sustain a cause of action under the [Maryland Uniform Trade Secrets] Act. As DTM points out, neither the Act nor the case law itself explicitly require[s] the plaintiff in a trade secrets case to be the outright owner of the trade secret at issue. But DTM is also correct from a historical standpoint.
>
> \* \* \*
>
> Maryland's law of conversion fully reflects this heritage. In order to recover for conversion, one must either have been in *actual possession* or have had the right to immediate possession in the converted asset.
>
> \* \* \*
>
> The Court concludes that possession, not ownership or right to title, is all that is required to sustain a cause of action under the Uniform Trade Secrets Act. Accordingly, the Court finds that AT & T's ownership defense would not constitute a valid dispositive defense and that preclusion of discovery into the issue of DTM's ownership of the Orca Blue technology can have no prejudicial impact on the ability of AT & T to continue in this litigation.

(Citation, footnote, and internal quotation marks omitted).

Contending that the district court erred in this ruling, AT & T argues that well established principles of trade secrets law oblige a plaintiff, as part of its *prima facie* case, to establish that it owns the trade secret that is the subject of the dispute, *see Surgidev Corp. v. Eye Tech., Inc.,* 648 F.Supp. 661, 679–80 (D.Minn.1986) (first element in a trade secret claim is that the "plaintiff is the owner of a trade secret"), or that the plaintiff has come to possess the trade secret, either by way of assignment, license, or some other means of conveyance from the trade-secrets owner or discoverer such that the owner no longer has a right to use the trade secret, *see Licorish v. Exxon Corp.,* No. 84–5603, 1985 U.S. Dist. LEXIS 20184, \*3 (E.D.Pa. Apr. 30, 1985). Accordingly, AT & T argues that proof that DTM's possession of the trade secrets in "Orca Blue" is wrongful would provide it a complete defense against DTM's suit, regardless of the manner by which AT & T obtained the trade secret.

■ DTM accepts the proposition that as part of its *prima facie* case, it must show either that it developed the trade secret at issue or otherwise is in lawful possession of it. It asserts that it is prepared to present evidence at trial on the means by which it developed "Orca Blue" to satisfy this obligation. DTM, however, disagrees with AT & T's contention that if AT & T proved that DTM misappropriated "Orca Blue" technology from a third party, AT & T would be exonerated of its own misappropriation of that technology from DTM. DTM relies on the Maryland law of theft which provides that "[i]t is not a defense to theft that the property was taken, obtained, or withheld from a person who had obtained possession of the property by illegal means." Md.Code Ann., Art. 27, § 343(b).

■ To the extent that a trade secret misappropriation case draws on principles of personal property law, we agree with

the district court that a traditional property-law analysis may be helpful in determining a plaintiff's standing to assert a misappropriation claim. *See, e.g., Varo, Inc. v. Corbin Mfg. Co.,* 50 F.R.D. 376, 378 (E.D.Pa.1970); 4 *Milgrim on Trade Secrets* § 15.01[1][a][iv] (2000) (noting that "where an individual develops allegedly trade secret matter and utilizes it within an individual proprietorship and later incorporates the business, the successor corporation must allege and prove assignment to it of the alleged trade secret" to have standing to sue); *see also* Restatement (Second) of Torts § 895(1) (1977) (stating that a defendant generally cannot assert the rights of a third party who enjoys superior rights in the damaged land or chattel to the plaintiff as a defense for his own liability to the plaintiff, even when the plaintiff himself is a converter and in wrongful possession).

■ But the question of whether "fee simple ownership" is an element of a claim for misappropriation of a trade secret may not be particularly relevant in this context. While trade secrets are considered property for various analyses, *see e.g., Bond v. PolyCycle, Inc.,* 127 Md.App. 365, 732 A.2d 970, 977 (1999) (concluding that trade secrets are "assets" and "property" of a corporation and noting that an employee's taking of computer files containing trade secrets "constituted a theft" (citations and internal quotation marks omitted)), the inherent nature of a trade secret limits the usefulness of an analogy to property in determining the elements of a trade-secret misappropriation claim. The conceptual difficulty arises from any assumption that knowledge can be owned as property. The "proprietary aspect" of a trade secret flows, not from the knowledge itself, but from its secrecy. It is the secret aspect of the knowledge that provides value to the person having the knowledge. The Mary-

land Uniform Trade Secrets Act, Md.Code Ann., Com. L. Art. § 11–1201 *et seq.,* thus defines a trade secret as information that has value because it is not "generally known" nor "readily ascertainable." *Id.* § 11–1201(e). While the information forming the basis of a trade secret can be transferred, as with personal property, its continuing secrecy provides the value, and any general disclosure destroys the value. As a consequence, one "owns" a trade secret when one knows of it, as long as it remains a secret. *See id.* § 11–1201(c). Thus, one who possesses non-disclosed knowledge may demand remedies as provided by the Act against those who "misappropriate" the knowledge. A misappropriation occurs when one *acquires* the secret information "by improper means" or *discloses* the secret information acquired by "improper means."

Thus, the concept of a "fee simple" interest in a trade secret, or any proprietary interest, is not entirely useful in defining the elements of a misappropriation claim. In supervising the further prosecution of this case, the district court should instead articulate the elements of the claim based on the language of the Uniform Trade Secrets Act and have the factfinder measure the proof of the parties against those elements.

■ Accordingly, if DTM demonstrates that it possesses secret information satisfying the definition of § 11–1201(e) and that AT & T misappropriated that information, as defined in § 11–1201(c), by improper means, as defined in § 11–1201(b), then DTM may be entitled to the remedies authorized by §§ 11–1202 through 11–1205. AT & T may defend the action by demonstrating, among other things, that DTM failed to satisfy its burden of proving the existence of a trade secret as defined in § 11–1201(e). Relevant to such a defense would be AT & T's

assertion that persons other than DTM possessed the same information, including AT & T itself. This fact alone, however, would not destroy DTM's claim to a trade secret. Thus, if only DTM and AT & T have the information and if both have undertaken to maintain its secrecy, the information might well still have value and therefore satisfy the definition of a trade secret. *See E.I. DuPont De Nemours & Co. v. United States,* 153 Ct.Cl. 274, 288 F.2d 904, 911 (1961). But of course, because either party could voluntarily disclose the information generally, such a trade secret's value might be ephemeral. Similarly, if the United States possesses the information (a matter the United States neither confirms nor denies) but maintains it as a secret, DTM may be able to claim that a trade secret exists.

■ More relevant, perhaps, is the question whether AT & T "misappropriated" the secret information in the sense defined by the Act. *See* Md.Code Ann., Com. L. Art. § 11–1201(c). Proving this element would require DTM to show that AT & T used improper means to acquire from DTM the information currently in AT & T's possession. *See id.* § 11–1201(c); *see also id.* § 11–1201(b) (defining "improper means"). While DTM could attempt to prove that AT & T violated the confidentiality agreements by misusing disclosures made during negotiations, AT & T might attempt to prove that it always possessed the information, as did others in the industry, and that the information was therefore neither secret nor misappropriated.

Accordingly, we answer the district court's first question in the affirmative, concluding that fee simple ownership in its traditional sense is not an element of a trade secrets misappropriation claim in Maryland.

### III

■ On the second question of whether the district court's recognition of the "state secrets" privilege requires termination of this litigation, we agree with the district court's analysis and its conclusions.

Responding to AT & T's claim that it needed discovery from the United States about the United States' alleged technology in order to establish a defense that the technology is "generally known in the industry," the district court pointed out that the evidence would be irrelevant because the information would still be a secret and therefore not probative of what is "generally known in the industry." The court appropriately observed that "[a] secret may still be a secret, though shared by others," and continued, "While AT & T remains free to establish that other companies in non-secret ways may have developed technology similar or identical to Orca Blue, it does not need to delve into the possible existence of the [United States' technology] to do so." The court concluded on this subject:

> The court is satisfied that this case can go forward through remaining discovery and trial without risking disclosure of any materials which have been ruled out-of-bounds. This is not a case in which "the very subject matter of[the] litigation is itself a state secret," and thus neither party should have any "incentive to probe dangerously close to the state secrets themselves." DTM ought not lose its day in court simply because its case may involve a level of complexity necessitating additional preparation and motions *in limine* before the matter gets to the jury.

(Alteration in original, footnote omitted) (quoting *Fitzgerald v.. Penthouse Int'l, Ltd.,* 776 F.2d 1236, 1238 n. 3 (4th Cir. 1985)).

In its brief on appeal, AT & T maintains that the district court's ruling "completely prevents AT & T from developing its defenses based on DTM's lack of ownership, rightful possession, right to exploit, and lack of secrecy pertaining to the alleged trade secrets in light of the Government's development of the technology." It asserts that if the government has evidence that is relevant to these defenses, as it believes, then "dismissal [is] mandated."

The evidence protected from discovery in this case is potentially relevant to some aspects of AT & T's defense, but it is not central to the question of whether AT & T is liable for trade secret misappropriation, and thus AT & T overstates its importance. DTM has undertaken to prove at trial "that [it] developed the technology that constituted trade secrets that did all kinds of things that AT & T couldn't do, [that the technology] had enormous value to AT & T and value which they appreciated, and [that] AT & T stole [it]." That DTM has a valuable secret can be proved or disproved even if, as AT & T alleges, the government also has the same secret. More importantly, as the district court noted, the court has not precluded AT & T from discovering from others in the industry whether they use the same technology claimed by DTM as a trade secret, nor has the court precluded AT & T from presenting evidence that it created its own technology prior to or independently of its contacts with DTM. Moreover, that AT & T did not misappropriate the secrets also can be proved or disproved without any evidence from the United States. The district court's prohibition of discovery into whether DTM's trade secret information was developed when DTM employees did work for the government may affect AT & T's efforts to impeach the employees or attack aspects of DTM's damage claim. But even allowing for this possibility, we cannot conclude at this stage as a matter of law that a fair trial cannot be had.

■ In *Farnsworth Cannon, Inc. v. Grimes*, 635 F.2d 268 (4th Cir.1980) (en banc), we held that when a plaintiff's attempt "to establish a prima facie case would so threaten disclosure of state secrets . . . [,] the preservation of [the] state secrets" requires dismissal of the plaintiff's case. *Id.* at 281; *see also In re Under Seal*, 945 F.2d 1285, 1287–88 (4th Cir. 1991); *Fitzgerald*, 776 F.2d at 1243–44. While we held in both *Fitzgerald* and *In re Under Seal* that dismissal of the plaintiff's case was mandated following the government's invocation of its states secrets privilege, we did not establish a categorical rule mandating dismissal whenever the state secrets privilege is validly invoked. As we noted in *Fitzgerald*, any such categorical rule would be unfair, and for that reason, we expressed our opinion that, in the proper case, a court, using "creativity and care," could devise "procedures which [would] protect the privilege and yet allow the merits of the controversy to be decided in some form." 776 F.2d at 1238 n. 3. Therefore, unless "the very question upon which the case turns is itself a state secret," or the circumstances make clear that "sensitive military secrets will be so central to the subject matter of the litigation that any attempt to proceed will threaten disclosure of the privileged matters," *id.* at 1241–42, the plaintiff's case should be allowed to proceed, even if some otherwise relevant evidence might not be presented. We believe that these principles are applicable here, at least based on the current state of the record.

Of course, whatever we decide now must be tempered by the recognition that this appeal is an interlocutory one and that the nature of the evidence ultimately presented will determine the ultimate application of these principles. But as the record now

appears, the district court's recognition of the state secrets privilege, asserted by the United States, does not foreclose the possibility of a fair trial. Indeed, the district court firmly believes that "this case can go forward through remaining discovery and trial without risking disclosure of any materials which have been ruled out-of-bounds." We conclude that the court should proceed in this fashion.

*AFFIRMED AND REMANDED FOR FURTHER PROCEEDINGS*